# In the United States Court of Federal Claims

No. 08-682C
**BID PROTEST**
**(Originally Filed Under Seal October 10, 2008)**
**(Reissued October 20, 2008)**

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
NORTEL GOVERNMENT SOLUTIONS,          *
INC.,                                 *
                                      *
          Plaintiff,                  *
                                      *
     v.                               *    Bid Protest, Agency Override
                                      *    Determination, Injunctive Relief
THE UNITED STATES,                    *
                                      *
          Defendant                   *
                                      *
          and                         *
                                      *
SYSTEMS RESEARCH AND                  *
     APPLICATION CORPORATION          *
                                      *
     Intervenor-Defendant             *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

**Daniel R. Forman**, Crowell & Moring, LLP, Washington, D.C., attorney of record for plaintiff, **James J. Regan, John E. McCarthy, Jr.,** and **Puja Satiani**, of counsel.

**Stephen C. Tosini**, Department of Justice, Washington, D.C., with whom was **Assistant Attorney General Gregory G. Katsas**, for defendant. **Jeanne E. Davidson**, Director, **Martin F. Hockey, Jr.**, Assistant Director, and **James E. Hicks**, of counsel.

**John S. Pachter**, Vienna, Virginia, attorney of record for intervenor-defendant, and **D. Joe Smith, Jonathan D. Shaffer,** and **Mary Pat Gregory**, of counsel.

## OPINION & ORDER

*Futey*, **Judge**.

This matter is before the Court on Plaintiff's Complaint For Declaratory And Injunctive Relief. Insofar as plaintiff has requested injunctive relief, it has filed separate motions for a Temporary Restraining Order and a Preliminary Injunction. Also before the Court are Defendant's Motion For Judgment And Opposition To Plaintiff's Motion For Injunctive Relief, Intervenor-Defendant's Opposition To Plaintiff's Application For Temporary Restraining Order And Motion For Preliminary Injunction, and Plaintiff's Reply To Defendant's Opposition To Plaintiff's Motion For Injunctive Relief And Cross-Motion For Judgment On The Administrative Record. Plaintiff, Nortel Government Solutions Incorporated ("NGS"), contests a Drug Enforcement Agency ("DEA") override of an automatic Competition in Contracting Act ("CICA") stay that was triggered when plaintiff filed a bid protest at the Government Accountability Office ("GAO"). The protested procurement was awarded to Systems Research and Applications Corporation ("SRA"), intervenor-defendant in this action. Plaintiff alleges that defendant's override decision is arbitrary and capricious, and requests that this Court declare that the DEA override decision is invalid, and enjoin and restrain DEA from proceeding with performance of the protested contract.

Plaintiff asserts five bases in support of its claim. First, plaintiff points out that DEA's Determinations and Findings ("D&F"), in which defendant justifies its decision to override the stay pursuant to 31 U.S.C. § 3553(d)(3)(C) (2004), does not address whether and how overriding the stay will remedy the alleged adverse consequences defendant attributes to maintaining the *status quo*. Second, plaintiff contends that defendant's assertions of adverse consequences are based on factual misstatements and that extending the current contracts is a reasonable alternative to the override. Third, plaintiff claims that defendant failed to fully consider the risks to DEA if the GAO sustains plaintiff's protest. Fourth, plaintiff argues that defendant did not consider the impact of the override on competition and the integrity of the procurement system. Finally, plaintiff asserts that the prospect of cost savings is an insufficient basis for overriding the stay.

Defendant, on the other hand, argues that the Acting Administrator of the DEA permissibly decided to override the automatic stay of the contract award due to deterioration of DEA's information technology ("IT") capabilities under the current situation. Specifically, defendant claims that the override is in the best interests of the United States and that the current situation presents an "urgent and compelling" circumstance because delay in proceeding with the contract will [***]. D&F at 6, ¶ 5. Additionally, defendant asserts that plaintiff is not otherwise entitled to injunctive relief because: (1) plaintiff fails to demonstrate immediate irreparable harm; (2) plaintiff fails to show that the balancing of the harms favors injunctive relief; and (3) plaintiff has not established that public interest favors injunctive relief.

Intervenor-Defendant, SRA, similarly opposes plaintiff's requests, and argues that plaintiff cannot meet the four standards necessary for an award of temporary or preliminary injunctive relief. SRA claims that plaintiff is unlikely to succeed on the merits of its case at the GAO, and that the

balance of harms favors the DEA.

1.    Background

        The record reveals that the dispute over the procurement currently at issue has been on-going for more than two years.  The procurement was initiated by DEA in July 2006, and is for Enterprise Management Services ("EMS"), which involves the consolidation of all DEA's IT operations and maintenance ("O&M") efforts under one contract.  The EMS procurement seeks to consolidate work that was and is being performed by multiple IT contractors, including plaintiff.  Since January 2007, DEA's IT systems have been operating under month-to-month "bridge" contracts with the incumbent contractors; the same bridge contracts that DEA now claims must be vacated due to urgent and compelling circumstances.

        The EMS contract was initially awarded to plaintiff, NGS, in January 2007, but was subsequently protested by SRA at the GAO.  At the time of SRA's protest, defendant entered into bridge contracts with the incumbent contractors to maintain defendant's IT support services until the protest was resolved.  Plaintiff holds two of the four bridge contracts.[1]  Defendant did not defend the award decision, but instead took corrective action that included issuing a revised statement of work in September 2007.

        In January 2008, DEA awarded the contract to SRA.  Plaintiff protested that contract award at the GAO, and defendant, on the recommendation of the GAO, again took corrective action; plaintiff's protest action was consequently dismissed.  In June 2008, defendant re-opened the solicitation, and again awarded the contract to SRA on September 10, 2008.  On September 22, 2008, plaintiff filed a protest action at the GAO, which triggered an automatic stay of performance on the contract under CICA.  On September 26, 2008, however, defendant notified GAO and the parties of its decision to override the stay under 31 U.S.C. § 3553(d)(3)(C), asserting that performance of the contract is in the best interests of the government, and that urgent and compelling circumstances do not permit delay of contract performance until the GAO decision.[2]

        On September 29, 2008, plaintiff filed a complaint with this Court, challenging defendant's override decision, and requesting declaratory and injunctive relief.

2.    Discussion

        A.    *Standard of Review*

---

        [1]The other two bridge contracts are held by Catapult and Sabre.  Defendant has not alleged any staffing shortages or other problems with regard to either of these contracts.

        [2]The GAO decision will be released by December 31, 2008.

"[A] Motion for Judgment on the Administrative Record, pursuant to RCFC 52.1, is similar but not identical to a Motion for Summary Judgment, pursuant to RCFC 56." *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 97-98 (2006)(citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005)). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Jay v. Sec'y, DHHS*, 998 F.2d 979, 982 (Fed. Cir. 1993). In contrast, under Rule 52.1, the court must weigh the evidence when considering a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1355-56. RCFC 52.1 is "designed to provide for a trial on a paper record, allowing fact-finding by the trial court." *Id.* at 1356.

This Court reviews bid protest actions under the standards of the Administrative Procedure Act ("APA"). *See* 28 U.S.C. § 1491(b)(1)-(4) (2008). The Court of Federal Claims has explained that "[a]gency procurement actions should be set aside when they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'without observance of procedure required by law.'" *KSD, Inc. v. United States*, 72 Fed. Cl. 236, 250 (2006)(citing 5 U.S.C. § 706(2)(A), (2)(D) (2000); *Bannum*, 404 F.3d at 1351). In determining whether defendant has acted arbitrarily and capriciously, the court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 709 (2006)(citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Moreover, the Supreme Court has identified four grounds upon which such a holding could be based: (1) "if the agency has relied on factors which Congress has not intended it to consider;" (2) if the agency has "entirely failed to consider an important aspect of the problem;" (3) "if the agency offered an explanation for its decision that runs counter to the evidence before the agency;" or (4) if the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Reilly's Wholesale Produce*, 73 Fed. Cl. at 709. If an agency decision is found to be arbitrary and capricious, the court "may award any relief that the court considers proper, including declaratory and injunctive relief . . .." 28 U.S.C. § 1491(b)(2); *see also Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181 (2007).

B.    *Jurisdiction*

The Tucker Act, as modified by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110 Stat. 3870 (1996), grants this Court jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract *or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.*" 28 U.S.C. § 1491(b)(1)(emphasis added). Significant to our inquiry, the "phrase 'in connection with' is very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). This court therefore has jurisdiction to review an agency's

override decision issued under 31 U.S.C. § 3553(d)(3)(C).

C.      *The Administrative Record*

On October 3, 2008, defendant submitted an Administrative Record ("AR"), pursuant to the Court's order.  The Court subsequently allowed the AR to be supplemented with the September 29, 2008 and October 6, 2008 declarations of Eric H. Smith, submitted by plaintiff, and the declaration of William G. Wasner, submitted by intervenor-defendant.  This supplementation of the AR will assist the Court in conducting a "thorough, probing, in-depth" review of the agency action.  *See* **Cubic Applications, Inc. v. United States**, 37 Fed. Cl. 345 (1997); **Myers Investigative & Sec. Servs. v. United States**, 47 Fed. Cl. 288, 293-94 (2000); **Savantage Fin. Servs., Inc. v. United States**, 81 Fed. Cl. 300, 310 (2008).

D.      *Was DEA's Override Decision Arbitrary and Capricious?*

1.      CICA's automatic stay provision

When a bid protest action is initiated at the GAO, an automatic stay of the protested contract award is triggered under CICA until the protest action is resolved.  31 U.S.C. § 3553(c)(1).  This automatic stay serves the important purpose of preserving "competition in contracting and ensur[ing] a fair and effective process at the GAO."  **Reilly's Wholesale Produce**, 73 Fed. Cl. at 710 (citing **Advanced Sys. Dev., Inc. v. United States**, 72 Fed. Cl. 25, 31 (2006)).  The automatic stay has been described as CICA's "teeth," and was included in the Act to prevent agencies from circumventing the procurement process.  **PGBA LLC v. United States**, 57 Fed. Cl. 655, 658 (2003).  Without the automatic stay, agencies could proceed to perform a contract while it was being protested at the GAO, and then later reject the GAO recommendation because it would be in the "best interest" of the agency to continue the contract.  *Id*.  Thus, the automatic stay provision "preclude[s] such *fait accomplis* and . . . facilitate[s] a fair and equitable remedy to venders who are illegally denied Government contracts."  *Id*. at 657 n.3 (citing H. Rep. No. 99-138, at 4-5 (1985)).

Nevertheless, an agency may override an automatic stay if it notifies the GAO in writing that either "performance of the contract is in the best interests of the United States," or "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest."  31 U.S.C. § 3553(d)(3)(C).  When asserting that urgent and compelling circumstances require immediate performance of a contract, there are several factors an agency must consider, including: (1) "whether significant adverse consequences will necessarily occur if the stay is not overridden;" (2) "whether reasonable alternatives to the override exist;" (3) "how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare[] to the benefits associated with the approach being considered for addressing the agency's needs;" and (4) the impact of the override on competition and the integrity of the procurement system, as reflected in CICA.  **Reilly's Wholesale Produce**, 73 Fed. Cl. at 711; *see also* **Superior Helicopter**, 78 Fed. Cl. at 189.  Failure by an agency to consider just one of these factors is fatal to

an override decision based on urgent and compelling circumstances.  When considering a best interests determination, there must be some rationale asserted by the agency that is above and beyond its original purpose when it solicited bidders for the procurement, and "that absolves the agency of its obligation to await the GAO's recommendation." *Advanced Sys. Dev.*, 72 Fed. Cl. at 31 (citing *PGBA*, 57 Fed. Cl. at 662).

2.      Urgent and compelling circumstances

Under the first prong of an "urgent and compelling circumstances" inquiry, an agency must show that significant adverse consequences will occur if the stay is not overridden.  Defendant asserts its override decision is proper here because its IT systems are of [*] importance to the performance of DEA's law enforcement mission, and urgent and compelling circumstances affecting the interests of this nation will not permit waiting for the recommendation of the GAO.  D&F at 2, ¶ 8.  Defendant's basic contention is that the current bridge contracts are no longer a viable option because of staffing shortages: "as EMS award neared, employers for the 'bridge' contracts began experiencing difficulty retaining qualified employees who were familiar with, knowledgeable about, and cleared to work on DEA's secure, law enforcement IT equipment." D&F at 3, ¶ 10.

Plaintiff contests defendant's findings, claiming that they are without factual support. Plaintiff asserts that staffing levels have "remained adequate to perform the required tasks." Mem. Of P. & A. In Supp. Of Pl.'s Application, at 16-17.  Specifically, plaintiff claims that DEA's own data "shows that NGS has maintained a consistently high level of performance without any significant impact on the level of service," and cites to DEA metrics data, which shows that DEA server and network availability has been consistently greater than 99% since January 2007.  *Id.* at 17 (citing First Smith Decl. ¶ 4).  Moreover, plaintiff contends that staffing levels are consistent with contractual requirements.  *See Id.* at 18 (In the EMS procurement, DEA states a need for 57 onsite systems administrators; currently, the incumbent contractor employs 65.  Furthermore, "the current help desk staffing level is based on a competitive bid selected by DEA in August 2007").

In the D&F, the first and second declarations of Dennis R. McCrary, and in Mr. McCrary's testimony at oral argument on October 7, 2008, defendant cites to several specific examples of how NGS staff shortages have adversely affected DEA's law enforcement mission.[3]  Plaintiff, however, claims that the examples and incidents listed by defendant bear no relation to services provided under the bridge contracts.  The Court will address each incident in turn.

---

[3]During oral argument on October 7, 2008, defendant introduced - for the first time - six exhibits in conjunction with Mr. McCrary's testimony.  Plaintiff strenuously objected to the admission of all exhibits on the basis that defendant provided neither plaintiff, nor the Court, with copies of these exhibits prior to oral argument.  The Court also finds defendant's presentation of these exhibits problematic.  Moreover, defendant failed to properly authenticate Exhibit 5, which appears to be a report generated by AT&T.  The Court nevertheless allowed the exhibits, but values the weight of each exhibit only as the Court deems appropriate.

(a)      *Impact on customer support services*

First, defendant argues that "IT Customer Support services have been impacted." D&F at 3, ¶ 10(b). Defendant asserts that "field agent trouble calls" are not being answered, and that there are "a large volume of *open problems* which the IT O&M support staff have been unable to resolve." *Id*. (emphasis added). Plaintiff, however, contends that "[t]he number of open trouble tickets has remained relatively constant since January 2007." First Smith Decl. ¶ 4. In response, defendant claims that Mr. Smith's reliance on open trouble tickets is a "gross misrepresentation of the current state of health of DEA's IT system," and points instead to the number of *unresolved tickets* as a more accurate indicator. Second McCrary Decl. ¶ 7. The record supports both parties' contentions; however, the D&F itself specifically refers to "open problems". *See Id*.; D&F at 3, ¶ 10(b). Moreover, at oral argument, Mr. McCrary testified that the help desk has been augmented with other people, and it was established that five new NGS employees were approved for processing by DEA on October 6, 2008. Tr. at 59:7-14, 18:8-12.

(b)      *Headquarters system failure*

Defendant also cites to a network device failure impacting 1,500 users in August 2008, to which "[t]he [IT Emergency Response Team] was unable to respond immediately due to staffing shortage under the 'bridge' contracts." D&F at 3, ¶ 10(c). At oral argument, Mr. McCrary explained that this problem was the result of a switch failure that went undetected, and that the delay in response caused a system failure. Tr. at 60:19-24. Plaintiff asserts, however, that DEA was aware that the switches need to be replaced, and that the DEA contractor responsible for maintaining the switches did not have the correct configuration file, which caused the delay. Second Smith Decl. ¶¶ 17-18. Notably, that contract is not one of the bridge contracts. *Id*. Defendant has presented no evidence to the contrary.

(c)      *New York system outage*

Additionally, defendant alleges that an IT O&M staffing shortage was directly responsible for the restoration of service delay during a 22 hour IT system outage in the New York Division in September 2008. D&F at 4, ¶ 10(d). Plaintiff, again, asserts that the restoration of service delay is not attributable to NGS or any of the bridge contractors. Rather, the problem is attributable to AT&T, DEA's telecommunications provider. AT&T initially sent an incorrect repair team, and later was unable to gain access to the room where its equipment was located, a room to which on-site IT O&M contractors likewise had no access. Second Smith Decl. ¶¶ 7-9. The DEA's Reason For Outage Report ("RFO") confirms plaintiff's statements. Second Smith Decl., Ex. 5.

(d)      *Chicago*

Defendant also claims that proper staffing levels contributed to the loss of a primary server in Chicago in August 2008; the loss was due to an overheated circuit board, which defendant contends would have been prevented if the cooling fan had been properly monitored. First McCrary

Decl. ¶ 5; Second McCrary Decl. ¶ 20.  Plaintiff argues that the failure of a cooling fan was not at fault, and explains that the problem was old and faulty hardware.  Second Smith Decl. ¶ 10.  Again, DEA's RFO for this incident supports plaintiff's contention, citing a faulty system board as the root cause of the problem, and noting that age causes servers to be more susceptible to hardware issues and problems.  Second Smith Decl., Ex. 5.  Defendant did not present any evidence contradicting plaintiff or its own RFO at oral argument.  *See* Tr. at 56-57.

(e)    *Cyber security*

Finally, defendant asserts that the "lack of IT O&M support capabilities under the current 'bridge' contracts would [***].  D&F at 4, ¶ 12.  At oral argument, Mr. McCrary stated that DEA is "constantly seeing viruses, isolating them and removing them," on an hourly basis, but that there is not sufficient staff to properly monitor the systems under the bridge contracts.  Tr. at 57:21-23; 58:6-11.  Nonetheless, Mr. McCrary went on to testify that DEA has not yet suffered any adverse consequences.  Tr. at 58:19-20.

The decision in ***Advanced Systems Development*** is instructive here.  *See* 72 Fed. Cl. 25.  In that case, the plaintiff was an incumbent provider of IT solutions to the Department of Defense, and was protesting the award of a consolidated IT support contract at the GAO.  *Id*. at 27.  The defendant there asserted three primary reasons justifying an override of the CICA stay: "inefficiency of the current model, the need for a smooth transition by permitting the awardee to immediately hire incumbent personnel, and avoiding a loss of IT services to the customer."  *Id*.  Like the case at bar, the D&F in that case stated "[t]heir current employer, even with a contract extension, could not offer stable employment for more than a few months and these individuals would likely seek other opportunities elsewhere."  *Id*. at 28.  The court expressed that while "loss of service might be a valid concern," there was no indication that service would be jeopardized, and defendant's concern regarding the availability of personnel during the transition period was not sufficient to justify an override of the CICA stay.  *Id*. at 31-32.  Moreover, the court found that the defendant's justification on the basis of "an exodus of required specialists" was internally inconsistent, because defendant had asserted that the awardee could fully staff the job, and then voiced "the unfounded concern that incumbent workers who might otherwise be interested in accepting employment with [the awardee], will be placed in limbo."  *Id*.  The court found that this justification for lifting the stay presented "the very type of competitive disadvantage that the CICA seeks to prevent."  *Id*. at 32.

Similarly here, defendant bases its override decision on alleged staffing shortages.  Nonetheless, defendant does not allege that there will be a loss of IT service; rather, its most severe contention is that DEA's current IT O&M support has deteriorated.  D&F at 6, ¶ 6.  Plaintiff has shown, however, that current staffing levels are adequate and that they are able to hire additional employees as needed.  Tr. at 17-18.  The specific examples provided by defendant allegedly demonstrating deterioration of IT services due to staffing shortages, are without support in the record.  In order for the court to uphold an override decision, the agency must "not only sort between the relevant and irrelevant factors, but must also render findings with respect to those that are relevant that do not 'run[] counter to the evidence before the agency.'"  ***Reilly's Wholesale Produce***,

73 Fed. Cl. at 711 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (additional citations omitted)). Moreover, defendant has failed to provide any support for its bald assertion that the current bridge contracts leave DEA open to [***].  Perhaps even more importantly, however, defendant has not given any indication as to how proceeding with the EMS contract will alleviate these concerns.  *See Superior Helicopter*, 78 Fed. Cl. at 188-89.  SRA itself noted during oral argument that it will be staffing the contract with employees from NGS as well as from the other bridge contractors.  Tr. at 74-76.  Thus, while the staffing situation under the protested contract may be preferable to defendant, defendant has failed to show that significant adverse consequences make proceeding with the contract *necessary*.

As a corollary to this Court's finding that there are no significant adverse consequences to maintaining the *status quo* that necessitate the override, and for the reasons explored in detail above, the bridge contracts provide a reasonable alternative to proceeding with the EMS contract. Defendant, however, failed to even consider whether reasonable alternatives to the override exist, stating only that "these 'bridge' contracts are no longer a viable option and there are no other alternatives available."  D&F at 3, ¶ 10.  Therefore, defendant also fails to satisfy the second prong of the urgent and compelling circumstances inquiry.  Additionally, the Court notes that these bridge contracts have been in place for 22 months.  During that time, three contract awards, including the one currently at issue, have been protested at the GAO; yet, until now, DEA has never attempted to override the stay.  Therefore, during the previous bid protests, DEA must have found the bridge contracts to be a reasonable alternative to proceeding with the protested contract awards.  The record reveals no drastic change in the performance of the bridge contracts over the past 22 months that would alter this determination, aside from defendant's preference to begin performance of the EMS contract.  While frustration with the prolonged nature of this solicitation is understandable, it alone is not sufficient justification to override the stay.

The third prong of the inquiry requires an agency to fully consider how the potential cost of proceeding with the override, specifically the costs associated with the possibility that GAO sustains plaintiff's protest, balance against the benefits associated with proceeding to perform the protested contract.  Defendant fails to do so here.  With regard to the pending protest at the GAO, the D&F states:

> I have considered the possibility that the GAO could sustain NGS' protest.  In the event that should happen, any corrective action directed would naturally result in additional costs and effort by DEA.  Notwithstanding those costs and energies, it is essential that DEA have in place a sustainable IT O&M capability now and in the future.  By proceeding with this contract, DEA would have that capability and would be able to maintain it, albeit at higher cost and effort, even if corrective action is ordered.

D&F at 5, ¶ 16.  This statement is problematic for several reasons.

First, defendant gives unacceptably brief treatment to the potential costs of a GAO

recommendation sustaining the protest.   This is particularly disturbing in light of defendant's assertions regarding the extreme difficulties of recruiting and hiring IT personnel in a timely manner, the fact that "the personnel security clearance requirement generally adds an additional 90 days to the process," and defendant's concern over employees leaving the bridge contractors to seek more "stable" employment. D&F at 4, ¶¶ 11-12. Overriding the stay will do nothing to alleviate the issue of instability in employment; until the GAO issues its decision, employees of SRA will have no more job security than employees of the current bridge contractors.  Moreover, the difficulty in hiring and obtaining security clearance for IT staff, which defendant cites as an incentive to begin performance on the new contract immediately, actually counsels against overriding the stay.   Defendant emphasizes the cost of finding and screening new employees, which consequently presents a great risk to defendant if it proceeds with the contract and, in two months, the GAO sustains the protest.

Second, the D&F refers to DEA's ability to maintain its IT O&M capability in the future - even in the face of a recommendation invalidating the contract award - by proceeding immediately with contract performance.   This indicates an attempt by defendant to circumvent the competitive process by exactly the type of action Congress intended the automatic stay provision of CICA to prevent. *See Advanced Sys. Dev.*, 72 Fed. Cl. at 31 ("The automatic stay is intended to preserve the *status quo* during the pendency of the protest so that an agency would not cavalierly disregard GAO's recommendations to cancel the challenged award").

This, of course, indicates the fourth factor an agency must consider when issuing an override decision based on urgent and compelling circumstances: "the impact of the override on competition and the integrity of the procurement system." *Reilly's Wholesale Produce*, 73 Fed. Cl. at 711; *see also Superior Helicopter*, 78 Fed. Cl. at 189.   Defendant essentially asserts a national security argument regarding the necessity of the override:[***]. D&F at 3, ¶ 9.   Nonetheless, the record fails to demonstrate that abiding by the CICA stay will compromise the safety and welfare of agency personnel.   Moreover, defendant does not consider the impact of its override decision on competition at all.[4]  "Ultimately, the public's interest in a fair, competitive federal procurement system outweighs unsubstantiated claims, even those related to the public safety." *Superior Helicopter*, 78 Fed. Cl. at 200 (citing *Reilly's Wholesale Produce*, 73 Fed. Cl. at 716).   Thus, defendant's interest in overriding the stay here is outweighed by the public's interest in maintaining competition and the integrity of the procurement system.   In light of defendant's failure to meet any of the four prongs of an urgent and compelling circumstances inquiry, defendant's override on this basis is invalid.

3.       Best interests of the United States

Defendant also maintains that overriding the stay and proceeding with the new contract is in

---

[4]The Administrator merely states, "I am aware that the Competition in Contracting Act (CICA) requires Federal agencies to conduct full and open competition to the maximum extent possible.   While I have due regard for that requirement, and the role of the stay of contract performance pending a decision by the GAO, I find that DEA's needs require us to avail ourselves of the authority vested in us by Congress to override."   D&F at 5, ¶ 15.

the best interests of the United States.  D&F at 6, ¶ 1.  In order for a stay override to be proper under a best interests justification, "[t]here must be some rationale - above and beyond the principle aim originally sought when [the agency] decided to engage bidders in the competitive procurement - that absolves the agency of its obligation to await the GAO's recommendation.  *Advanced Sys. Dev.*, 72 Fed. Cl. at 31.  Thus, simply stating that the new contract is better or more cost effective is not enough to justify overriding the stay.  *Id.*  The Court has already concluded that defendant's assertions with regard to the necessity of overriding the stay amount to nothing more than defendant's strong preference to begin performance of the protested contract.  Mr. McCrary testified at oral argument that his problem is with the "bridge contract construct," which supports this finding.  Tr. at 60:6-7.  In support of its best interests override decision, defendant has also asserted a cost savings of approximately [*] per month if it is able to proceed with performance of the new contract, rather than continue under the bridge contracts.  Nonetheless, similar amounts have been found insufficient to support a best interests override.  *See Automation Techs., Inc. v. United States*, 72 Fed. Cl. 723, 728-29 (2006); *PGBA*, 57 Fed. Cl. 655.  Defendant has therefore failed to establish that overriding the stay is in the best interests of the United States.

Because defendant has failed to establish that overriding the stay is necessary because of urgent and compelling circumstances, or because it is in the best interests of the United States, defendant's override decision is invalid.  DEA failed to consider important, relevant aspects of the override analysis, and offered explanations that run contrary to evidence before it.  Defendant's decision to override the automatic CICA stay is consequently arbitrary, capricious, and contrary to law.

E.      *Relief*

In addition to declaratory relief, plaintiff has requested injunctive relief in the form of a Temporary Restraining Order, a Preliminary Injunction, and a Permanent Injunction.  For the reasons discussed below, however, we need not address this issue.

There is a line of reasoning in cases before the Court of Federal Claims that deems injunctive relief unnecessary and redundant where an invalidation of a stay override simply reinstates the statutory stay.  Judge Merow provides eloquent analysis:

> Declaratory relief has long been established as available in bid protest matters.  *See Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987).  Declaratory relief is particularly appropriate in bid protest actions contesting agency stay override determinations entered pursuant to 31 U.S.C. § 3553(d)(3)(C).  If, as here, the agency override determination is, after application of the review standard prescribed by 28 U.S.C. § 1491(b)(4), determined to lack validity, declaratory relief so ruling serves to reinstate the statutory stay of contract performance, during the GAO protest period automatically provided under 31 U.S.C. § 3553(d)(3)(A).  Congress did not require any evaluation of injunctive relief factors as a prerequisite to a stay of contract performance upon the filing of a protest with the GAO.  Thus,

it would be contrary to the legislative scheme to impose such an additional requirement, upon finding that an agency override determination lacks validity, in order to reinstate the statutory stay applicable during the GAO protest period. Declaratory relief preserves the scheme that Congress enacted.

*Chapman Law Firm Co. v. United States*, 65 Fed. Cl. 422, 424 (2005).[5]  The court in *Advanced Systems Development* further explains that there is "incongruity in forcing a plaintiff to meet the high burden necessary for obtaining extraordinary relief, when the statute gives presumptive weight to the otherwise requried showings of irreparable harm and public interest."  72 Fed. Cl. at 36.

We adopt this reasoning also.  Because we find defendant's override to be invalid, the automatic stay of performance is reinstated pursuant to CICA.

3.      Conclusion

For the foregoing reasons, Plaintiff's Complaint For Declaratory And Injunctive Relief is ALLOWED as follows: the DEA override is hereby declared invalid, and Defendant's Motion For Judgment is DENIED.  By operation of law, the automatic stay in Plaintiff's GAO bid protest is reinstated; it is therefore unnecessary to consider plaintiff's request for injunctive relief, it is moot. The Clerk shall enter judgment in accordance with this Opinion.  No costs.


IT IS SO ORDERED.


                            s/Bohdan A. Futey
                          **BOHDAN A. FUTEY**
                                **Judge**

---

[5]*See also Automation Techs.*, 72 Fed. Cl. at 730 n.5; *CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100 (2006); *but see Reilly's Wholesale Produce*, 73 Fed. Cl. at 708 n.7; *Superior Helicopter*, 78 Fed. Cl. 181.